1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LALIQUE, S.A., et al.,

4                    Plaintiffs,

5              v.                        13 Civ. 7033 (RA)

6    METROPOLITAN FINE ARTS &
     ANTIQUES, INC.,
7
                    Defendant.
8
     ------------------------------x
9                                       New York, N.Y.
                                        April 16, 2014
10                                      12:40 p.m.

11   Before:

12                        HON. RONNIE ABRAMS,

13                                        District Judge

14                            APPEARANCES

15   KAUFMANN GILDIN & ROBBINS LLP
          Attorneys for Plaintiffs
16   BY:  DANIEL GILDIN

17   WACHTEL MISSRY LLP
          Attorneys for Defendant
18   BY:  JOHN H. REICHMAN
          STELLA LEE
19

20

21

22

23

24

25

1          (Case called)

2          MR. GILDIN:  Daniel Gildin; Kaufman, Gildin & Robbins

3     for the plaintiff.

4          THE COURT:  Good afternoon.

5          MR. GILDIN:  Good afternoon, Judge.

6          MR. REICHMAN:  Good afternoon, your Honor.  John

7     Reichman from Wachtel Missry for the defendant.  To my left is

8     Stella Lee.  I'm pleased to report that Ms. Lee has now been

9     admitted to this district since our last appearance.

10          THE COURT:  Congratulations.

11          MR. REICHMAN:  And also in the courtroom is an intern

12    we have, Marie Donovitch, who is with us for a short time.

13          THE COURT:  Good afternoon.

14          So we're here to address defendant's motion to

15    dismiss.  I'll tell you up-front where I am and how I'm

16    inclined to rule and we can go from there, but I will keep an

17    open mind.  I know we're here for oral argument.

18          I'm inclined to let the trademark infringement and

19    false designation of origin claims move forward but dismiss the

20    other claims.

21          I have a few questions.  I promise I'll keep an open

22    mind and I'm happy to hear you out, but I wanted you to know at

23    the start where I was coming from and we can kind of go from

24    there.

25          So, Mr. Reichman, I know that puts you in a little bit

1    of a difficult position, but why don't I ask you a few

2    questions and then you can make whatever argument you'd like to

3    make.

4             MR. REICHMAN:  Sure.

5             THE COURT:  So can you cite any case where the court

6    held on a motion to dismiss as opposed to at summary judgment

7    or preliminary injunction hearing that the allegations

8    regarding removal of a serial number or a batch code did not

9    give rise to an infringement claim at that stage?

10            MR. REICHMAN:  I don't think I can with respect to a

11   removal of a serial number, but certainly there are analogous

12   cases where courts have dismissed the complaint on a pleading

13   stage because the complaint does not adequately allege either a

14   material difference or a violation of quality control

15   standards.  In particular, I'm thinking about Technomarine and

16   Brain Pharma cases which we cited in our brief.

17            THE COURT:  I'm aware of that.  I know in Technomarine

18   it was clear that there's no allegation of alteration of serial

19   numbers, but I recognize your point is a little bit different

20   about analogous cases.

21            Now, you argue that because Lalique doesn't put serial

22   numbers on its more inexpensive vases that its use of those

23   numbers on the more expensive products must necessarily be for

24   knowledge or pretextual purposes.  Is that accurate, is that

25   your argument?

1          MR. REICHMAN:  Not necessarily for pretextual

2     purposes.  I'm not raising that.  What we're arguing, your

3     Honor, is that the case law, and there's a number of cases that

4     we cited, are clear that there has to be a uniform policy.  You

5     can't go and complain about a practice that you are not

6     following.

7          THE COURT:  Can't they make a business decision that

8     this is for quality control purposes but it only really makes

9     sense for them to put in the money to do it on the more

10     expensive products and not the less expensive products?

11          MR. REICHMAN:  Well, of course they can make a

12     business decision.  But what they can't allege is a trademark

13     violation.

14          THE COURT:  I'm just looking at my transcript.  I was

15     looking back at something you said a moment ago, so that's why

16     I looked at my computer.  Go on.  I'm listening.

17          MR. REICHMAN:  What the cases, starting with the

18     Polymer case and a number of other cases that we've cited,

19     including the SKF, have said is that you have to have a uniform

20     policy with respect to products or similar products.

21     Otherwise, there can't be the confusion that is required in

22     order to show that there's been a trademark violation.

23          I mean let's take the specifics.  Again, let's say,

24     first of all, there is in our view no allegations with respect

25     to a quality control standard in the complaint.  It doesn't

1   exist.

2           THE COURT:  Let's just assume for a moment that I'm

3   going to consider the supplemental declaration.

4           MR. REICHMAN:  Okay.  So let's somehow -- let's ignore

5   your practice rules about amending complaints and let's assume

6   that all of the allegations in the declaration become part of

7   an amended complaint, it still doesn't state a cause of action.

8           Think about this.  What they're saying is I think 500

9   Euros equates to $670.  So they're saying a vase that has a

10  suggested price of $670 doesn't have serial numbers and one

11  that has a suggested price of $671 does.  And, of course,

12  nothing prevents any retailer from selling these products at

13  different prices.  So you don't have any kind of uniformity

14  with respect to this entire product line.

15          How can there be confusion when you have vases that

16  can be for all practical purposes the same and sell for almost

17  the exact same amount of money, one has serial numbers and one

18  doesn't?  How can there be any customer confusion?  There isn't

19  any allegation of customer confusion anywhere in the

20  declaration or in the complaint.

21          THE COURT:  Right.

22          MR. REICHMAN:  There's no explanation about how the

23  trademark is diminished, and that's why there is this rule in

24  all of the cases we've cited, you have to have, you have to

25  follow this practice with respect to all or mainly most of the

1    products.  In the SKF case, for example, where the manufacturer

2    didn't follow its practices with respect to I believe it was

3    12.5 percent of its products, the court said no deal, no

4    trademark violation because you haven't done this thing that

5    you're complaining of uniformly.  So put all those allegations

6    in the declaration.

7          THE COURT:  Haven't they done it uniformly for

8    particular lines of vases?  So maybe not with regard to every

9    vase, but with regard to all the lines of vases that either

10   cost a certain amount or particular lines of vases, haven't

11   they been consistent in that regard?

12         MR. REICHMAN:  First of all, they haven't

13   distinguished between the different types of vases.  So all

14   they're doing is based on price.  They're not saying the red

15   vases have serial numbers, the blue ones don't.  Ones that are

16   certain sizes have serial numbers, smaller ones don't.  They

17   based it on apparently a suggested retail price.  That's all.

18   And the courts have said when you're talking about a product

19   line, you can't make that kind of distinction.  Otherwise,

20   where is the customer confusion here?

21         THE COURT:  Are there any additional arguments?  I'm

22   happy to hear you out.

23         MR. REICHMAN:  When the courts look at both the

24   material difference test and the quality control test, at the

25   bottom line -- and those two tests, by the way, are really, as

1  Dan Combs said, need to be considered in tandem -- you're

2  really looking at is there some customer confusion, is there

3  some diminution in what customers are getting?

4          So look at the cases where there actually has been

5  found to be a trademark violation, even though there's been no

6  physical differences.  For example, there are cases that say,

7  well, if you don't provide a warranty, that's a difference.  So

8  a customer is getting something less when you don't put a

9  serial number on it because it means they no longer have

10 certain protections that they otherwise would.  They no longer

11 have the warranty, they no longer have the right to go back for

12 service.  So there is that difference.

13         Here, there's nothing alleged with respect to any

14 difference.  How is a customer hurt by the fact that it's

15 buying a vase without a serial number?  That is not explained

16 anywhere in the complaint; it's not explained anywhere in the

17 declaration.  And if a customer is not getting an inferior

18 product, if it's getting something that is for all practical

19 purposes the same, then there can't be any diminution of the

20 mark.

21         THE COURT:  If the purpose of the serial numbers is to

22 ensure that over time customers are provided with the same

23 quality product, is your reading of the law such that there

24 needs to be a showing that on any individual occasion one

25 person's vase is inferior that every person's vase is inferior?

1          MR. REICHMAN:  I'm not sure how to answer that,

2     frankly, your Honor.  I think what you need -- and maybe I need

3     the question back again.

4          THE COURT:  I'm going to look at my transcript.

5          Really what I'm getting at is the purpose of the

6     quality control line of cases, as I understand it, is to

7     protect the products over time, to protect the -- for a company

8     to be able to see over time if there's counterfeiting, if there

9     are defects, if there's a need for recall, and to be able to

10    identify their products over time.

11         The argument that you seem to be making was that there

12    always has to be, it really seems like it's based on material

13    difference and not on quality control, that there's always got

14    to be in every particular case an inferior product that the

15    each individual is getting, that each consumer is getting, as

16    opposed to over time.  And as I read the quality control line

17    of cases, the idea is to protect the products again over time.

18         MR. REICHMAN:  But I don't see -- again, protecting,

19    you're right.  If over time removing the serial numbers on a

20    vase that's sold for $671 as opposed to $670 resulted in some

21    diminution of the products that the consumers are getting or

22    some consumer confusion, then, yes, over time.  But there's no

23    indication anywhere in the declaration or the complaint how

24    over time it would be any different than the way it is now.

25         THE COURT:  But isn't that a factual question?  You

1    may well be right and your client may be successful on summary

2    judgment, but isn't that a factual question?

3         MR. REICHMAN:  I think what they have to allege in the

4    complaint -- and, again, by saying the complaint, include the

5    allegations in the declaration that there will be consumer

6    confusion.  There will be inferior products that are presented

7    and explain why.  I mean it wouldn't be hard.  If there was

8    anything that was how customers would be impacted, they could

9    say, look, because they don't have a serial number, then this

10   customer doesn't have certain protections.  They don't say

11   that.  They don't say anything like that.

12        So it's the case now that customers aren't getting

13   anything less and there's no indication anywhere in the

14   complaint or the declaration that that situation would be

15   different in the future.

16        THE COURT:  I'm looking, for example, to the

17   declaration -- it's the supplemental declaration of Maz

18   Zouhairi -- and I'm looking at paragraphs 10 through 13 which

19   describes the purposes of the serial numbers, among other

20   things.  Paragraph 10 indicates that Lalique maintains a

21   database of all the serial numbers, limited edition numbers

22   imprinted upon the items manufactured by it.  The serial

23   numbers and limited edition numbers are utilized by Lalique to

24   control the quality and distribution of its products.  Through

25   its serial numbers and limited edition numbers Lalique can

1    identify when any particular numbered item, including

2    exclusively numbered items, was manufactured and to whom it was

3    initially sold.

4           And then it goes on from there and in paragraph 11 it

5    states in part Lalique also utilizes its serial numbers and

6    limited edition numbers to ensure that its products are of the

7    highest quality by being able to track the date of manufacture

8    of any numbered item in context of service, repair,

9    maintenance, or defect issue.  And then 12 talks about

10   authenticating the numbered items.

11          So, again, the question is just for purposes of a

12   motion to dismiss, is this sufficient?

13          MR. REICHMAN:  I don't believe so.  And let me read

14   something from Technomarine that dealt with this issue.

15          THE COURT:  Just give me a second.  Let me get the

16   case out.  What page are you going to read from, please?

17          MR. REICHMAN:  This is starting at right at the end of

18   490 going to 491.  It's under footnote 5 in the Westlaw.  The

19   court said, However, cases in which the quality control test

20   has supported a nongenuineness claim routinely and more

21   specifically alleged an actual disruption in quality control

22   procedures and as such disruption has or would be likely to

23   damage the product itself and, thus, impact the value of the

24   mark.

25          So here there's nothing to indicate there would be any

E4GLLALA                    Argument

1   damage to the product itself.  And once you have that there's

2   no damage to the product itself, then you have no impact on the

3   value of the mark, which is of course what the trademark law is

4   all about.  Customers are getting nothing less when they get a

5   vase with a serial number removed, and there can't possibly be

6   customer confusion either because, again, getting back to the

7   argument I made before, they don't have a uniform policy with

8   respect to vases or products, at least as it's out there in the

9   marketplace.

10       THE COURT:  Let's just say we don't know now if the

11  vases in this case were counterfeit.  And I'll address

12  questions to Mr. Gildin about that, but let's say there are

13  entities out there that are creating counterfeit Lalique vases

14  that are not in fact manufactured by Lalique, and Lalique wants

15  to be able to try to track them down and to find them.  And if

16  the using of serial numbers, even if it's just for a limited

17  number of vases that are more expensive, helps them in the

18  process of doing that, doesn't that ultimately ensure the

19  quality of the Lalique mark?

20       I mean you're focusing on what customers are getting,

21  are customers getting the real thing, are they getting a

22  product that's as good, but in a scenario in which it happens,

23  couldn't the serial numbers help them ensure that customers

24  ultimately get the Lalique product as it should be?

25       MR. REICHMAN:  Well, there's first and foremost, your

1    Honor, I think that kind of argument could have some resonance

2    if they actually followed it with respect to all of the

3    products it produced, but they don't. They don't. So how

4    can -- it's not as if this is a simple test: There's a serial

5    number, therefore, it's genuine. There's not a serial number,

6    it's not a genuine Lalique product. If they actually followed

7    it uniformly, maybe your contention would have more resonance.

8    I don't think it has any resonance where they don't uniformly

9    put serial numbers on the products.

10            THE COURT: All right. Thank you.

11            Mr. Gildin.

12            MR. GILDIN: Your Honor, do you want to ask me

13   anything or do you want me to just respond?

14            THE COURT: I'm happy to give you the opportunity to

15   respond. I did want to ask a couple questions.

16            Are you still arguing that the vases may be

17   counterfeit, meaning, they were not in fact manufactured by

18   Lalique?

19            MR. GILDIN: That is one of the choices.

20            THE COURT: And what are the facts in your complaint

21   to support an allegation that they were in fact counterfeit?

22            MR. GILDIN: The fact is that they don't have serial

23   numbers. There are two choices. By virtue of the fact that

24   they don't have serial numbers, there are two choices. One is

25   they are not genuine and never were genuine, and the other is

1    that they were genuine Lalique at one point in time but were

2    altered and are no longer genuine.  And I believe it's

3    paragraph 24 that refers to the products not being genuine.  I

4    believe I used the word counterfeit.  I believe it's 24.

5              No.  It's 33.  I apologize.  Paragraph 33, Judge.

6              THE COURT:  Is that something you think you're going

7    to be able to ultimately determine through discovery?

8              MR. GILDIN:  I don't have a clue.  Honestly, I don't

9    know.  Let me put it to you this way.  The limited discovery

10   that we have had answers certain questions and answers far from

11   all questions because the documents we actually received do not

12   show, other than the name, other than in some cases and not in

13   all, the name of the product that was sold.  They don't really

14   match up with what was purchased and what was sold.

15             So, for instance, where we received information on

16   purchases and sales from I believe it was January 1, 2012 until

17   the date of production, we don't know whether a product sold in

18   2012 was purchased in 2012 so that we can match it up to a

19   purchase, or was purchased before 2012 so we have nothing to

20   match it up to.  So we don't know the answer to these

21   questions.

22             Would I on a bet say to you I'm going to be able to

23   prove that any of these products that were sold were never

24   genuine Lalique?  I honestly don't know.  I would say no, I

25   wouldn't be able to prove that, but I don't know it yet and I

1    don't believe it's unreasonable to try to find out.

2              THE COURT:  And what additional information do you

3    think you need to be able to figure that out?

4              MR. GILDIN:  All of their purchases and sales and

5    depositions.  If it turns out that I can match up purchases and

6    sales from the one dealer regarding whom we received documents.

7              THE COURT:  That's the Lalique dealer in Paris.

8              MR. GILDIN:  That is the Lalique dealer in Paris.  If

9    we can match everything up and we have nothing, then we'll have

10   nothing.  I don't enjoy spitting into the wind.  But I think it

11   would be reckless for me to suggest at this point in time that

12   it's not a possibility.

13             THE COURT:  Relatedly, does the complaint in your view

14   allege any material difference between the vases?

15             MR. GILDIN:  I believe it alleges a material

16   difference.  I believe that --

17             THE COURT:  What's the material difference?

18             MR. GILDIN:  The material difference is that a

19   customer who buys a vase that should have a serial number that

20   does not have a serial number, if something ever goes wrong

21   with it, is going to send it to Lalique and Lalique is going to

22   say we don't know what this is because they can't match it up

23   to a date of manufacture and to a dealer to whom it was sold.

24             So that's the first and most obvious answer is that

25   there may be little reason for Lalique to take care of a

customer who has a product that does not have the number that

it should have on it because it's not necessarily unreasonable

for Lalique to conclude that that is not a genuine Lalique

product.  That's the whole point of the exercise is to

eliminate that possibility.  And, yes, it wasn't always done,

but it's counterintuitive to suggest that because it wasn't

always done you can't do it now.

        And it is equally counterintuitive to suggest that

because you're not going to do it on the $50 product or the

hundred dollar product, you can't do it on the more expensive

products.  And to suggest that because there is a line that is

drawn that $1 on one side of the line is not so different than

$1 on the other side of the line and, therefore, you're not

entitled to protection.  We certainly are not entitled to

protection on those items where there were never serial numbers

or where we can't prove that that item should have had a serial

number.

        THE COURT:  Okay.  Any other responses you'd like to

make, I'm happy to hear them.

        MR. GILDIN:  Well, I think your Honor has stated the

concepts better than I ever could.  But I really think that if

you look at the Zino Davidoff and if you look at your own

L'Oreal, you get the answers you need.  We are at the pleading

stage; we're not at the proof stage.  And to suggest that this

case should not go forward is just misguided.

1          Thank you, your Honor.

2          THE COURT:  Thanks.  Anything else from you,

3   Mr. Reichman?

4          MR. REICHMAN:  Yes.  I'll be brief.

5          With respect to the last point Mr. Gildin made that

6   somehow there will be some diminution to customers of getting

7   vases without serial numbers, there is nothing anywhere in the

8   complaint or the declaration that says that.  There's nowhere,

9   for example, does the declaration say, well, you know, if a

10  customer brings in a vase without a serial number, we won't

11  take care of it but we would if it had a serial number.

12  There's nothing in the record at all to that effect, nothing in

13  the complaint.  And then after being presented or given or

14  taking the opportunity to present additional facts to the

15  Court, there still is nothing to show that there's any real

16  difference of any kind.

17         With respect to the issue of counterfeiting, I believe

18  it's sanctionable for Lalique to continue to assert that claim

19  at this point.  There's nothing in the complaint that provides

20  any support for a counterfeiting allegation.  There's nothing

21  that says there's falsified logos.  There's nothing that says

22  there's inferior products.  And, by the way, it's not as if

23  they wouldn't have had an opportunity for years and years and

24  years to know whether Metropolitan has been selling counterfeit

25  products.  They have been competing in the same neighborhood

1    for years.  They've gone to Metropolitan and bought products.

2    They've gone to Metropolitan and seen the products that are

3    being sold.

4          And not only on top of that, because of the limited

5    discovery the Court ordered, they've been provided with

6    invoices from the Parisian dealer showing where they got the

7    merchandise.  And for them to continue now and say we want to

8    pursue this issue of counterfeiting on some supposition is so

9    grossly unfair.  And my client should have to incur tens of

10   thousands of dollars in legal fees because they have some idea

11   without any proof, without any evidence that this is going on?

12   It's simply wrong.

13          THE COURT:  All right.

14          MR. GILDIN:  May I?

15          THE COURT:  Yes.

16          MR. GILDIN:  Very briefly.  Simply two issues.

17   Counsel just referred to we don't claim that there's any

18   falsified logos.  Well, that's the whole point, there's no

19   logo.  I don't know whether counsel is acknowledging -- I don't

20   think he is -- that his client has removed the serial numbers.

21   But someone did, if they are genuine Lalique, someone did.

22   Maybe it's the dealer in Paris, maybe it's his client, I don't

23   know.  But I don't hear an acknowledgment that his client did

24   it and, therefore, to suggest that we should ignore

25   possibilities I think is unreasonable.

1    The other is that we asked for the right to come in

2    and audit and take a look and see what's in the store and so

3    far that's been rejected.  We need to get to the meat of this

4    and the meat of this is to find out who's doing this.  Maybe it

5    was the dealer in Paris, maybe it was the defendant; we have to

6    find out.

7    THE COURT:  Thank you.  What I'd like to do is just

8    take a break for five minutes.  So we'll adjourn right now and

9    resume in five minutes.

10    (Recess)

11    THE COURT:  Having considered the parties' arguments

12    I'm prepared to rule.  For the following reasons I'm going to

13    grant defendant's motion in part and deny it in part.  In my

14    view, plaintiff has plausibly alleged a trademark infringement

15    and false designation of origin claim.  I'm dismissing the

16    federal and state dilution claims, the state law consumer

17    protection claim, and common law unfair competition claim.  The

18    motion is therefore denied as to Counts One and Two and granted

19    as to Counts Three, Four, Five, and Six.

20    Before I turn to the merits of the motion, I'd like to

21    address the dispute about which documents are properly before

22    the Court.  The complaint in this case alleged that all Lalique

23    vases are imprinted with a serial number or limited edition

24    number -- for simplicity, I'll just call it a serial number.

25    See paragraph 24 of the complaint.  When Mr. Reichman appeared

for the initial conference on October 7, 2013, he brought with

him three Lalique vases, which he asserts that he purchased

from the Lalique retail store, that did not have any serial

numbers.  At the conference, Mr. Gildin responded to the effect

that not all Lalique vases have serial numbers.

Plaintiff subsequently submitted the supplemental

declaration of Maz Zouhairi, which clarified that not all

Lalique vases have serial numbers, and specified which vases do

have serial numbers; namely, those with a suggested retail

price of at least 500 Euros, as well as several other lines.

Defendant asks me to disregard the supplemental

declaration.  I'm not going to do that.  The Court is not going

to consider Mr. Gildin's statement -- which was made in

response to evidence defendants produced at a hearing to

discuss scheduling -- without offering him the opportunity to

clarify the statement.  Either the Court considers the original

complaint and nothing more, or it considers Mr. Gildin's

statement alongside the supplemental declaration.

Plaintiff has asked to amend its complaint,

specifically to conform to the statements made in the

supplemental declaration.  See page 20 of its opposition.

Because in any event I'd have to determine whether the proposed

amendment is futile -- that is, whether it would survive a

motion to dismiss, see Milanese v. Rust-Oleum Corp., 244 F.3d

at 10 (2d Cir. 2001) -- I'll consider the supplemental

declaration for purposes of this motion.

Turning to the substance of this motion, I'll begin with Counts One and Two, which allege trademark infringement and false designation of origin under the Lanham Act.  As is relevant here, the elements of each claim are the same: Plaintiff must allege that its mark is entitled to protection and that defendant's use of the mark is likely to cause consumer confusion.  See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 114-115 (2d Cir. 2006).  As a matter of law, consumer confusion does not arise when a defendant merely resells a genuine good bearing a true mark even though the sale is not authorized by the trademark holder.  See Zino Davidoff S.A. v. CVS Corp., 571 F.3d at 243 (2d Cir. 2009). Goods are not genuine, however, if they differ materially from the product authorized by the trademark holder for sale or if they do not conform to the mark holder's quality control standards.  See Id.

Plaintiff has not plausibly alleged a material difference between its products and those defendant sells.  The only difference alleged in the complaint is that the products defendant sold lacked a serial number.  Nowhere does the complaint allege that the removal of the serial numbers otherwise altered the appearance of the products, cf. Zino Davidoff, 243 F.3d at 246, and my decision in L'Oreal, 2013 WL 4400532 at 18.  Nor does the complaint allege that the presence

E4GLLALA            Decision

1   of a serial number entitles the owner to additional warranty

2   protection or other post-sales services.  Cf. Bel Canto Design

3   Limited v. MSS Hifi Inc., 837 F.Supp.2d at 231 (S.D.N.Y. 2011).

4   Plaintiff has not cited any case for the proposition that the

5   mere absence of a serial number in itself amounts to a material

6   difference, nor has the Court encountered such a case.

7           The Court reaches a different conclusion, however,

8   with respect to plaintiff's quantity control argument.  Goods

9   that do not conform to plaintiff's quality control measures are

10  not genuine and therefore infringing if plaintiff can show (i)

11  it has established legitimate, substantial, and nonpretextual

12  quality control procedures, (ii) it abides by those procedures,

13  and (iii) the nonconforming sales will diminish the value of

14  the mark.  See Warner-Lambert Co. v. Northside Development

15  Corp., 86 F.3d at 6 (2d Cir. 1996).  Here, paragraph 24 of the

16  complaint and paragraphs 10 through 13 of the supplemental

17  Zouhairi declaration describe the purposes of imprinting vases

18  with serial numbers, which includes ensuring that products are

19  authentic and tracking the date of manufacture in the context

20  of repair or defect.  The Second Circuit has recognized both

21  purposes as legitimate and nonpretextual, see Zino Davidoff,

22  571 F.3d at 244-46, and plaintiff's complaint plausibly alleges

23  that sales of nonconforming products will diminish the mark's

24  value.

25          Defendant takes aim at the second prong, asserting

that plaintiff does not abide by these procedures because it

admits that it sells some vases that do not contain serial

numbers.  Although the question is a close one, the Court

cannot say at this stage that plaintiff's decision to affix

numbers on only some of its vases renders its claims legally

insufficient.  It appears that plaintiff's decision about which

vases to imprint depends on the value of the vase.  The Second

Circuit explained in Warner-Lambert that "a trademark holder is

entitled, without losing its right to protect what value the

mark has, to make a business judgment that additional quality

control measures would add less value to the mark than their

cost."  86 F.3d at 7.  By that reasoning, then, a trademark

holder can decide that it's not worth it to use certain quality

control measures on inexpensive products, without having to

worry that trademark protection of its more expensive products

will be impaired.

        Ultimately, the fact that Lalique only puts serial

numbers on certain products may be fatal to its infringement

claims.  But the Court needs to know other information that

bears on its purpose behind using the numbers, such as how the

numbers are used to identify counterfeit vases and how

Lalique's employees are trained to use those measures.  It is

simply too early to decide this issue as a matter of law,

however, and none of the cases defendant cites -- Polymer, SKF,

and Dan-Foam -- persuade the Court otherwise.

1        Plaintiff also asserts that the products defendant

2   sells may be counterfeit, that is, manufactured by a third

3   party unaffiliated with Lalique.  I note that plaintiff has not

4   alleged any facts that typically support a claim of

5   counterfeiting, such as inferior workmanship and materials or

6   falsified logos.  See, for example, Technomarine SA v. Jacob

7   Time, Inc., 905 F.Supp.2d at 488 (S.D.N.Y. 2012).  Because I'm

8   allowing Counts One and Two to go forward on a grey goods

9   theory, however, I'm not going to preclude plaintiff from

10  attempting to show counterfeiting.

11       Count Three alleges trademark dilution under federal

12  law, and Count Five alleges dilution under New York law.  To

13  prevail on either count, plaintiff must allege, among other

14  elements, that defendant used a mark that diluted the value of

15  plaintiff's mark through either tarnishment or blurring.  See

16  Starbucks Corporation v. Wolfe's Borough Coffee Incorporated,

17  588 F.3d at 105 and 114 (2d Cir. 2009).  Tarnishment refers to

18  situations in which a defendant's mark harms the reputation of

19  plaintiff's mark by associating it with products of poor

20  quality or portraying it in an unwholesome or unseemly context.

21  Plaintiff has not plausibly alleged tarnishment because the

22  only difference between the two products the complaint alleges

23  is that defendant's vases lack a serial number.  Nor does the

24  complaint plausibly allege blurring, which occurs when a

25  defendant uses a mark that is similar to plaintiff's and that

1    impairs the distinctiveness of plaintiff's mark.  Here,

2    defendant is not purporting to sell anything other than genuine

3    Lalique products, although the parties dispute whether those

4    products were in fact genuine, this is not a case where

5    defendant is using some separate mark that impairs the

6    distinctiveness of the Lalique products.  See, for example,

7    Oleg Cassini Inc. v. Weber's 32nd Street Corporation, 2008 WL

8    2780988 at 2 n.4 (S.D.N.Y. 2008), which notes that a dilution

9    claim requires the use of two distinct marks.  I'm therefore

10   dismissing the dilution claims; nothing plaintiff has submitted

11   suggests that this defect could be cured through amendment.

12        Count Four alleges a violation of New York General

13   Business Law Section 349, which prohibits deceptive trade

14   practices.  As my decision in L'Oreal explains, the majority

15   view in this circuit is that trademark infringement claims are

16   not cognizable under Section 349 unless there is a specific and

17   substantial injury to the public interest over and above

18   ordinary trademark infringement or dilution.  2013 WL 4400532

19   at 22.  Here, the only harms the complaint alleges are those

20   typically associated with trademark infringement, such as

21   consumer confusion.  Nowhere has plaintiff suggested how it

22   would amend its complaint to allege such a harm.  Count Four is

23   therefore dismissed.

24        Finally, Count Six asserts a claim for unfair

25   competition.  To establish such a claim, plaintiff must

plausibly allege a claim under the Lanham Act coupled with a

showing of bad faith.  See, for example, Coach, Inc. v. Horizon

Trading USA, Inc., 908 F.Supp.2d at 436 (S.D.N.Y. 2012).  Here,

plaintiff has not even attempted to allege bad faith, see

paragraphs 82 through 84 of the complaint.  I'm therefore going

to dismiss this claim.  I will, however, permit plaintiff to

amend this claim.

         To summarize, I'm denying the motion as to Counts One

and Two.  I'm granting it as to Counts Three, Four, and Five,

and dismissing those claims with prejudice because amendment

would be futile.  I'm also granting the motion as to Count Six,

the unfair competition claim, but I will grant leave to amend

that claim.

         So in light of my ruling, let's talk about next steps

here.  I understand plaintiff is still seeking discovery.  Both

sides will want discovery.  I will appreciate that the

preliminary injunction request is still outstanding, but I

don't know that we need to have the preliminary injunction

hearing, summary judgment briefing, and then a trial.  I want

to see if there's a way to preserve some resources here, so why

don't we talk about that.

         First of all, are you seeking a jury trial in this

case?  And the reason I'm asking, of course, is I generally

think it's more efficient if you're not seeking a jury trial to

combine a preliminary injunction hearing with a trial on the

E4GLLALA                    Decision

1   merits if in fact it's going to be a bench trial, if it gets to

2   that.

3           MR. GILDIN:  That all sounds quite sensible.

4           THE COURT:  Is there a need for a court reporter at

5   this stage?

6           MR. GILDIN:  No.

7           THE COURT:  We'll go off the record.

8                           o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25